Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Justin A. Calabrese, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and
GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE  COMPANY
and GEICO CASUALTY COMPANY,

                  Plaintiffs,

      -against-

TOP Q, INC.,
LEVY DAVIDOV,
JOHN DOES "1" – "3" and
JOHN DOE COMPANIES "1" – "3",

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Docket No.:

**Plaintiffs Demand a Trial
by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, referred to hereinafter

as "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as

follows:

## **INTRODUCTION**

1.      This action seeks to recover more than $192,000.00 that Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent claims seeking payment for durable medical equipment ("DME") and orthotic devices (e.g. cervical collars, lumbar-sacral supports, electronic muscle stimulator units, egg crate mattresses, etc.).  These goods purportedly were provided to individuals who were involved in automobile accidents and were eligible for insurance coverage under GEICO insurance policies ("Insureds").

2.      The Defendants' fraudulent conduct includes, but is not limited to:

> (i)     participating in a scheme with various No-Fault medical offices (the "Clinics") and their associated physicians and/or chiropractors ("practitioners") to dispense unnecessary DME and orthotics pursuant to fraudulent pre-determined protocols;

> (ii)    unilaterally dispensing various forms of DME and orthotics without medical support or justification for the items purportedly dispensed;

> (iii)   intentionally mischaracterizing the nature of the DME and orthotics provided and manipulating the reimbursement formulas for the goods so as to claim monies to which they were never entitled; and

> (iv)    refusing to provide full and complete responses to GEICO's lawful requests for verification of the charges submitted to GEICO for No-Fault reimbursement.

3.      In addition, GEICO seeks a declaration that it is not legally obligated to pay more than $335,000.00 in fraudulent claims that have been submitted through TOP Q, Inc. (hereinafter, "TOP Q") because:

> (i)     Defendants TOP Q and Levy Davidov ("Davidov") made false and fraudulent statements to GEICO concerning the maximum permissible charges for the DME and orthotic devices they allegedly provided to Insureds in order to obtain from GEICO payment under the New York "No-Fault" laws to which they are not entitled;

(ii)     Defendants TOP Q and Davidov purchased inexpensive and arguably counterfeit DME and orthotics, purportedly provided the devices to GEICO insureds and misrepresented the nature and quality of the products by submitting to GEICO inflated charges with improper reimbursement codes;

(iii)    Defendants TOP Q and Davidov made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices that never were dispensed to Insureds;

(iv)     The charges submitted by Defendants TOP Q and Davidov are the results of unlawful kickbacks with the Clinics which are the sources of the prescriptions; and

(v)      Defendants TOP Q and Davidov regularly failed and/or refused to adequately provide full particulars of the nature of the DME and orthotic devices they purported to have supplied to Insureds.

4.     The Defendants fall into the following categories:

(i)      Defendant TOP Q is a New York corporation that purports to purchase DME and orthotic devices from various wholesale DME and orthotic device dealers.  TOP Q purportedly then dispenses the equipment and orthotics to Insureds while systematically submitting fraudulently inflated claims to GEICO and other New York automobile insurers.

(ii)     Defendant Davidov owns and controls TOP Q and submitted to GEICO and other New York automobile insurers fraudulently inflated bills seeking reimbursement for DME and orthotics purportedly dispensed by Davidov through TOP Q.

(TOP Q and Davidov are hereinafter collectively referred to as the "Retail Defendants").

(iii)    John Doe Companies "1" – "3" are New York companies which, in exchange for kickbacks, sold to the Retail Defendants, various inexpensive and arguably counterfeit DME and orthotics that purportedly provided by the Retail Defendants to GEICO Insureds.

(iv)     John Does "1" – "3" own John Doe Companies "1" – "3" and each agreed to participate in the fraudulent scheme perpetrated by the Retail Defendants.

(John Doe Companies "1" – "3" and John Does "1" – "3" are collectively hereinafter referred to as the "Wholesale Defendants").

3

5.      As discussed below, the Defendants at all times have known that the claims for DME and orthotic devices submitted to GEICO were fraudulent because: (i) the equipment was prescribed and dispensed pursuant to fraudulent pre-determined protocols established by the Retail Defendants and laypersons at the Clinics without regard to medical necessity; (ii) most of the prescriptions were the byproducts of unlawful kickbacks with the layperson owners of the Clinics that were the source of the prescriptions; (iii) the claims misrepresented the nature and quality of the DME and orthotic devices that were actually provided; (iv) the charges intentionally were inflated based upon an exploitation of the payment formulas set forth in New York's "No-Fault" laws; and (v) in many cases, the goods and related services billed to GEICO never were actually provided to the Insureds in the first instance.

6.      As such, the Retail Defendants do not now have – and never had – any right to be compensated for their claims for DME and orthotic devices.  The chart attached hereto as Exhibit "1" sets forth a representative sample of more than 1800 fraudulent claims that have been identified to-date that the Retail Defendants submitted, or caused to be submitted, to GEICO. The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry began in 2016, has continued uninterrupted since that time, and resulted in damage to GEICO of more than $192,000.00

## THE PARTIES

### I.      Plaintiffs

7.      Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is

authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.    Defendants**

8.      TOP Q is a New York corporation with its principal place of business in Flushing, New York.  Pursuant to generic prescriptions generated from various No-Fault medical "mills", TOP Q purported to provide patients with various forms of DME and orthotics.

9.      Most of the equipment provided however was inexpensive, poor quality products that are available to the public for mere fractions of TOP Q's charges to GEICO and other automobile insurers.  TOP Q was incorporated on March 29, 2016 and from that time through March 2017, TOP Q and Davidov knowingly submitted more than $1.2 million in fraudulent claims to GEICO.  In addition to submitting the fraudulent claims, TOP Q has filed and continues to file costly collection lawsuits and arbitrations against GEICO seeking reimbursement on the fraudulent claims despite having no right to reimbursement.

10.     Defendant Davidov is a citizen of New York and at all relevant times owned and controlled Defendant TOP Q.

11.     Defendants John Doe Corporations "1" through "3" are New York corporations with their principal places of business in New York.  John Doe Corporations "1" through "3" provided the Retail Defendants with the inexpensive DME, orthotic devices and other equipment that were in turn ultimately provided by the Retail Defendants to GEICO insureds.

12.     John Doe Corporations "1" through "3" sometimes provided the Retail Defendants with fraudulently inflated wholesale invoices that were in turn used by the Retail Defendants to calculate the fraudulent charges submitted to GEICO for reimbursement.

13.     Defendants John Does "1" through "3" are citizens of the state of New York.  At all relevant times herein, John Does "1" through "3" owned and controlled John Doe Corporations "1" through "3".

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the No-Fault Laws and Licensing Statutes**

16.     GEICO underwrites automobile insurance in the State of New York.

17.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.) (Collectively referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

18.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

19.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment

6

for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3"). In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

20. Pursuant to Section 403 of the New York State Insurance Law, the NF-3s and HCFA-1500 Forms submitted by healthcare providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

21. Similarly, all HCFA 1500 (CMS-1500) Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

## II. Regulations Governing Maximum Reimbursement for Durable Medical Equipment and Orthotic Devices

22. DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. Although not always medically necessary, durable medical equipment often dispensed include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), hot/cold packs, infrared heat lamps, lumbar cushions, orthopedic car seats,

transcutaneous electrical nerve stimulators ("Tens units"), thermophores (electrical moist heating pads), cervical traction units, and whirlpool baths.

23.     Orthotic devices, a subgroup of DME, are instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars (i.e., "whiplash" collars), lumbar supports, knee orthotics, ankle supports, wrist braces, and the like.

24.     The No-Fault Laws set forth maximum charges that may be submitted by healthcare providers for DME and orthotic devices. One of the primary purposes in limiting the maximum charges for DME and orthotic devices is to ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME and orthotic device charges. In a June 16, 2004 Opinion Letter, the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and orthotic device charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

> (A copy of the June 16, 2004 Opinion Letter is attached as Exhibit "2.")

25.     Effective October 6, 2004, the maximum permissible charge for DME and orthotic devices is the fee payable for such DME and orthotic devices under the New York State Medicaid program at the time such DME and orthotic devices are provided. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct 6, 2004)).

26.     If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable shall be the lesser of the acquisition cost (i.e., the line item

cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent, or the usual and customary price charged to the general public. See 11 N.Y.C.R.R. (Appendix 17-C, Part F (a) (effective Oct. 6, 2004)).

27.    With the subsequent enactment of 12 N.Y.C.R.R. § 442.2 (2011) it was explained that there was no further need for Appendix 17-C Part F since No-Fault follows the Workers' Compensation Fee Schedule and therefore No-Fault could adopt that fee schedule.  As a result, 11 N.Y.C.R.R. 68 Appendix 17-C, Part F was repealed.  Nevertheless, the language in the Workers' Compensation Fee Schedule as it relates to durable medical states:

> (a) The maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided… If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:
>
>> (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or
>>
>> (2) the usual and customary price charged to the general public.

28.    Insurers such as GEICO are entitled to receive a proper proof of claim. See 11 N.Y.C.R.R. § 65-3.8(f). To be eligible for payment, a claim seeking reimbursement for DME and/or orthotic devices must include a description of the "full particulars of the nature and extent" of the items and services for which payment is sought. See 11 N.Y.C.R.R. § 65-1.1.

## III.   An Overview of the Defendants' Fraudulent Scheme

29.    The Defendants perpetrated a scheme through which the Retail Defendants, through TOP Q, submitted to GEICO more than $1 million in fraudulent claims, seeking reimbursement for DME and orthotic devices.

30.     To date, the Retail Defendants have wrongfully obtained more than $190,000.00 from GEICO, and there are more than $335,000.00 in additional fraudulent claims that have yet to be adjudicated and remain unpaid.

31.     The fraudulent scheme perpetrated by the Retail Defendants involves the Retail Defendants, the Wholesale Defendants and the participation of the Clinics and practitioners who prescribe or purportedly prescribe DME and orthotics for GEICO Insureds.

32.     Upon information and belief, the Retail Defendants paid kickbacks to various multi-disciplinary No-Fault Clinics, controlled by unlicensed laypersons, which purport to provide treatment to high volumes of Insureds.

33.     As part of the fraudulent scheme, and in exchange for the kickbacks, the operators/managers of the Clinics caused to be prescribed large amounts of DME and orthotic devices that purportedly were supplied to Insureds by the Retail Defendants.

34.     The prescriptions were never given to the Insureds, but as part of the scheme, they were routed directly to the Retail Defendants to ensure that the Insureds did not fill the prescriptions with legitimate DME/orthotic device retailers.

35.     In exchange for the kickbacks, the clinic operators/managers caused to be prescribed DME and orthotic devices that *were not* covered by the New York State Medicaid fee schedule, thus enabling the Retail Defendants to seek reimbursement on the DME and orthotic devices based on their purported acquisition costs with respect to such goods.

36.     To the extent that the Clinic operators/managers caused to be prescribed DME and orthotic devices that *were* covered by the New York State Medicaid Fee Schedule, they ensured that the prescriptions were written in a generic, non-descript manner, thus enabling the Retail Defendants to: (i) misrepresent the nature and quality of the items intended for the patient

and (ii) misrepresent the nature and quality of the items that the Retail Defendants actually dispensed so as to claim entitlement to a higher fee payable.

37.     In order to maximize the fraudulent charges that they could submit to GEICO and other insurers, the Retail Defendants sought out various DME wholesale companies, i.e., the Wholesale Defendants, which sold to the Retail Defendants, inexpensive and sub-standard equipment.

38.     Upon information and belief, the Retail Defendants entered into secret agreements with the Wholesale Defendants whereby – in exchange for a share in the profits of the fraud – the Wholesale Defendants provided the Retail Defendants with counterfeit, low-quality DME at the lowest possible prices which were negotiated by the Retail Defendants.

39.     The Retail Defendants then sought from GEICO and other insurers, the maximum reimbursable fee for many of the goods – "kicking back" a portion of the proceeds to the Wholesale Defendants.

40.     Upon information and belief, although the Retail Defendants appear to have paid the invoice amounts and nothing more, the payment methodology was merely a façade because on many occasions the Wholesale Defendants converted the checks to cash through various methods and returned a substantial portion to the Retail Defendants while keeping a portion for themselves.

41.     The Retail Defendants could afford to rebate to the Wholesale Defendants a portion of the proceeds they retained from GEICO because the difference between their cost for the goods and the maximum reimbursable fee for the items were immense.

42.     Upon information and belief, some of the proceeds were used by the Retail Defendants to "purchase" prescriptions from the Clinics (i.e., the kickbacks) and to maintain a steady flow of cash to facilitate the scheme.

43.     Much of the DME and orthotics purchased by the Retail Defendants from the Wholesale Defendants were inexpensive products manufactured in China, then imported, packaged and distributed to No-Fault DME retail companies, like the Retail Defendants.

44.     In many cases, these products were counterfeit products and cheap knock-offs of legitimate products that the Center for Medicare & Medicaid Services ("CMS") have analyzed and assigned a particular Healthcare Common Procedure Coding System Code ("HCPCS Code").

45.     The Wholesale Defendants ensured that the products were manufactured and "branded" with particular HCPCS Codes and imported into the United States for distribution

46.     The various DME wholesale companies then flooded the markets with the substandard devices, and sold the goods to retail companies, including the Retail Defendants.

47.     The Retail Defendants dispensed the goods using what purported to be legitimate HCPCS codes and demanded exorbitant fees for the products.

48.     Nevertheless, the Retail Defendants systematically represented that the inexpensive DME obtained from the Wholesale Defendants and purportedly dispensed to GEICO Insureds were high-quality and expensive products by submitting charges that far exceeded the true value of the products.

49.     The charges are so outrageous that no reasonable patient would ever pay the exorbitant prices for the substandard devices – had the patients been given the opportunity to choose their own pharmacy or retailer in the first instance.

50.     The Retail Defendants then created and submitted thousands of bills that deliberately omitted any meaningful information regarding the DME and orthotic devices, including the manufacturer, make and model of the DME and orthotic devices that the Retail Defendants purportedly dispensed to Insureds.

51.     The Retail Defendants' creation and submission of such generic billing prevented GEICO and other insurers from identifying the manufacturer, make and model of the DME and orthotic devices and concealed the fact that: (i) the DME and orthotic devices dispensed by the Retail Defendants, to the extent that they were provided at all, were inexpensive low-quality products that cost a mere fraction of what was represented; (ii) the Retail Defendants, in virtually every instance, charged GEICO and other insurers far more than the maximum permissible amounts for the DME and orthotic devices that were supplied; and (iii) the Retail Defendants frequently billed GEICO and other insurers for DME and orthotic devices they never supplied in the first instance.

52.     To further conceal the scheme, the Retail Defendants also failed to provide GEICO and/or refused to respond to repeated requests made by GEICO seeking information such as meaningful wholesale invoices containing descriptions of goods provided (i.e., make, model and manufacturer), proof of payment and additional information that would be necessary to determine whether the charges submitted by the Retail Defendants were legitimate and the result of bona fide arms-length transactions between the Retail Defendants and the Wholesale Defendants.

**IV.     Davidov's and TOP Q's Manipulation of the Prescriptions and Their Fraudulent Billing Scheme**

53.     Beginning in 2016, Davidov entered into kickback arrangements with various multidisciplinary Clinics that almost exclusively treated No-Fault patients.

54. Upon information and belief, many of these Clinics are owned, operated and managed by non-physicians who direct the treatment and billing related to the medical practices that operate within the Clinic walls.

55. In exchange for payments from Davidov, the Clinic operators/managers directed their associated practitioners to: (i) to systemically prescribe large amounts of virtually identical DME and orthotic devices to Insureds, without regard to the Insureds' symptoms, and (ii) to issue generic prescriptions for DME and orthotic devices, omitting specific descriptions of the devices required so as to permit Davidov to unilaterally select what DME or orthotic devices to dispense to Insureds.

56. Nearly every patient who treated at the Clinics was prescribed the same or similar sets of DME and orthotics despite the seriousness of the related accident or the types of injuries sustained by the patients.

57. Often times, even though the practitioners who evaluated the patients specifically recommended in their reports that particular items be given to the patients, the template prescription forms called for different pieces of equipment – some of which were never even considered or contemplated by the practitioners.

58. In some instances, the Retail Defendants and the Clinic operators/managers merely replicated the practitioners' signatures or had someone at the Clinic, other than the practitioner, simply sign the form.

59. In other instances, the Clinic operators/managers, as a condition to treating patients at the various Clinics, required the practitioner to sign prescription forms based solely on a review of MRI reports and nothing else.

60.     To justify the medical "necessity" of the devices, the Clinic operators/mangers ensured that the prescriptions for the additional products always coincided with MRI reports.

61.     For example, in almost each instance when an MRI of the lumbar spine yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" back braces.

62.     Similarly, in almost each instance when an MRI of the shoulder yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" shoulder braces.

63.     Likewise, in almost each instance when an MRI of the knee yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for one or more "custom" knee braces.

64.     In almost each instance when an MRI of the cervical spine yielded any positive results whatsoever, a prescription was provided to the Retail Defendants to support claims for cervical traction units.

65.     Upon information and belief, the Retail Defendants then paid kickbacks to the Clinic operators/managers for the prescriptions that were prepared by the Clinic employees and transmitted directly to the Retail Defendants to support their claims.

66.     The fraudulent prescriptions were, in turn, used by the Retail Defendants to support the billing for the medically unnecessary equipment that they submitted to GEICO and to other automobile insurers.

67.     To facilitate the scheme, pursuant to their agreement with Davidov (and in exchange for a share in the profits of the scheme and to support the efforts of Davidov and TOP

Q to negotiate kickback arrangements with the Clinics), one or more of the Wholesale Defendants provided Davidov and TOP Q with the inexpensive DME.

68.    Upon information and belief, one or more of the Wholesale Defendants also provided the Retail Defendants with purchase invoices which sometimes included inflated prices for the goods.

69.    In the alternative, the invoices sometimes included discount prices for substandard and arguably counterfeit products.

70.    Although the Retail Defendants refused to submit the purchase invoices with their billing submissions, the Retail Defendants relied on the inflated prices as a basis for their calculation of charges they submitted to GEICO for reimbursement.

71.    In some instances, the Retail Defendants simply mischaracterized the nature of the items they purchased and purportedly dispensed to GEICO Insureds so as to claim reimbursement at a higher payable fee.

72.    In other instances, the Retail Defendants purchased inexpensive and arguably counterfeit orthotics and other devices from the Wholesale Defendants.

73.    Because such items purportedly are assigned a maximum reimbursable fee, the Retail Defendants negotiated with the Wholesale Defendants to ensure that they could purchase the poor-quality goods at the lowest possible rate.

74.    The Retail Defendants then charged the maximum reimbursable fee for each item which, in the aggregate, resulted in a virtual windfall for the Retail Defendants.

75.    For example, upon information and belief, the Retail Defendants paid one or more of the Wholesale Defendants approximately $45.00 for back braces which the Wholesale Defendants advertised as being approved for HCPCS Code L0627.

76.     The Retail Defendants then submitted charges of $322.98 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $278.00 per Insured.

77.     Similarly, upon information and belief, the Retail Defendants paid one or more of the Wholesale Defendants approximately $65.00 for back braces which the Wholesale Defendants advertised as being approved for HCPCS Code L0637.

78.     The Retail Defendants then submitted charges of $844.13 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $779.00 per Insured.

79.     Similarly, upon information and belief, the Retail Defendants paid one or more of the Wholesale Defendants approximately $50.00 for knee braces which the Wholesale Defendants advertised as being approved for HCPCS Code L1832.

80.     The Retail Defendants then submitted charges of $607.55 for each item purportedly dispensed to GEICO's Insureds – a profit of approximately $458.00 per Insured.

81.     Despite the fact they knew that legitimate products actually approved for the HCPCS Codes listed in their bills could not possibly have cost as little as they paid for the goods, the Retail Defendants used the HCPCS Codes provided by the Wholesale Defendants as a basis for their representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

82.     To further conceal their scheme, the Retail Defendants refused to provide, with their initial billing submissions, any information regarding the make, model or quality of the devices they purportedly dispensed to GEICO's Insureds.

83.     Additionally, despite GEICO's specific requests for this information, the Retail Defendants refused to provide proof of their costs for the products thereby preventing GEICO from assessing the quality and nature of the goods.

84.     Instead, the Retail Defendants simply submitted to GEICO purchase invoices which were intentionally redacted to conceal the Retail Defendants' true cost for the products and conceal the extent of their fraudulent conduct.

85.     Despite GEICO right to the information, the Retail Defendants continuously take position that their acquisition cost for the items is irrelevant to the calculation of charges for many of the goods because such goods are assigned a maximum reimbursable fee.

86.     The prices at which the Retail Defendants purchased the items is directly relevant to the nature and quality of the items dispensed to GEICO's Insureds and directly relevant to whether the HCPCS Codes used by the Retail Defendants in conjunction with their charges are in fact proper.

87.     Not only did the Retail Defendants and Clinic operators/managers agree to design and implement the prescription protocols, but much of the DME and orthotics listed on the prescriptions and dispensed by the Retail Defendants (if at all) contravened each patient's conservative treatment plans thus supporting the fact that the supplies were prescribed pursuant to predetermined protocols established by non-physicians as a means to generate profits.

88.     For example, although the associated physicians/chiropractors purportedly recommended for each patient a course of physical therapy which included stretching and bending to strengthen weakened areas of the back, knee and neck, the prescriptions invariably called for immobilizing devices such as lumbosacral supports, knee supports and cervical collars. Such devices would never be prescribed by an ordinary physician in a legitimate medical office environment.

89.     Additionally, pursuant to their agreement with Davidov, the Wholesale Defendants provided Davidov and TOP Q with inexpensive DME and orthotics with HCPCS

Codes that were used by and relied upon by Davidov and TOP Q as a basis for their representations that their claims for reimbursement were in accordance with the No-Fault laws when, in fact, they were not.

90.     In cases where the New York State Medicaid program has prescribed a fee payable for a given item or a class of items, the Retail Defendants relied on the vague and generic prescriptions issued by the Clinics to misrepresent the nature of the items actually prescribed and furthermore misrepresent the item that the Retail Defendants purportedly dispensed so as to claim entitlement to a higher fee payable.

91.     For example, the Retail Defendants submitted charges of $155.22 using HCPCS Code E0272 pursuant to prescriptions calling for "egg crate mattresses".

92.     The product represented by HCPCS Code E0272 is a thick (five inches or more) foam mattress that is placed directly onto a bed frame as a *substitute for* a regular bed mattress – a more expensive, substantial product than the egg crate mattress overlays indicated on prescriptions and provided by the Retail Defendants.  (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "3".)

93.     The mattresses actually provided by the Retail Defendants should more properly be coded E0199 at a charge of $19.48, representing a dry mattress pad for mattress or an egg crate "overlay", as opposed to an actual mattress.

94.     The Retail Defendants also submitted charges of $153.13 using HCPCS Code E0184 pursuant to prescriptions calling for "egg crate mattresses".

95.     The product represented by HCPCS Code E0184 is a thick (five inches or more) gel mattress that is intended to prevent bed soars for patients who are bed-ridden – a more expensive, substantial product than the egg crate mattress overlays indicated on prescriptions and

provided by the Retail Defendants. (Representative samples of the bills, prescriptions and delivery receipts are also annexed hereto as Exhibit "3".)

96. The mattresses actually provided by the Retail Defendants should more properly be coded E0199 at a charge of $19.48, representing a dry mattress pad for mattress or an egg crate "overlay.

97. The Retail Defendants submitted charges of $502.63 for cervical traction units using HCPCS Code E0855 pursuant to prescriptions calling for "cervical traction unit/no frame/no stand", "c/s posture pump" or "cervical traction unit a/ pump". (Representative samples of the bills, prescriptions and delivery receipts are also annexed hereto Exhibit "4.")

98. Because the units dispensed by the Retail Defendants were generally inexpensive items, the Retail Defendants knowingly purchased from one or more of the Wholesale Defendants, cervical traction units and represented that the units were legitimate devices by billing under HCPCS Code E0855.

99. In reality, the devices dispensed by the Retail Defendants are not assigned a fee and therefore are reimbursable at the lower of the Retail Defendants' acquisition cost, plus 50%, or the usual and customary price to the general public – approximately $60.00.

100. The Retail Defendants submitted charges of $690.23 using HCPCS Code L3671 pursuant to prescriptions calling for "Shoulder-Brace – Custom Fitted". (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "5".)

101. The product represented by HCPCS Code L3671 is a *custom-fabricated* device that is made from scratch through molds specifically designed to fit a particular patient – not the generic, pre-fabricated items actually provided to the patients and which have a lesser established fee payable.

102.    The product assigned to HCPCS Code L1832 is a prefabricated, off-the-shelf knee brace that requires custom-fitting and adjustment services by the service provider.

103.    Upon information and belief, the Retail Defendants purchased these knee braces from the Wholesale Defendants for approximately $36.00 and billed GEICO $607.55 for each device – supported by prescriptions calling for "knee orthosis". (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "6".)

104.    To the extent that the Retail Defendants actually provided these devices in the first instance, the Retail Defendants provided inexpensive, one-size-fits-all knee braces which were not "customized" or fitted at all.

105.    The product assigned to HCPCS Code L0637 is a prefabricated, off-the-shelf back brace that requires custom-fitting and adjustment services by the service provider.

106.    Upon information and belief, the Retail Defendants purchased these back braces from the Wholesale Defendants for approximately $65.00 and billed GEICO $844.13 for each device – supported by prescriptions calling for "lumbar sacral orthosis". (Representative samples of the bills, prescriptions and delivery receipts are annexed hereto as Exhibit "7".)

107.    In the event that a patient had any positive lumbar MRI findings whatsoever, each patient was purportedly provided with an inexpensive, one-size-fits-all back brace which was not "customized" or fitted at all and which were given to the patient by the Clinic receptionists.

108.    The Retail Defendants submitted charges for various other "custom-fitted" orthotics as explained earlier, but often times the items were never actually prescribed by the physicians or chiropractors.

109.  Although the Retail Defendants billed for these "custom-fitted" devices, neither Davidov nor any representative of TOP Q rarely (if ever) measured or fitted many of GEICO's Insureds in the first instance.

110.  The Retail Defendants simply dispensed "one-size fits all" supports with adjustable Velcro straps that were given to them by the Clinic receptionists.  For example:

  (i)   Top Q billed for a "custom" back brace (and other items) that purportedly was given to Patient AA from the receptionist at one of the Clinics, despite the fact that Patient AA was never measured or fitted with the "custom-fitted" device and was never informed why she received the equipment or how to use the equipment.

  (ii)  Top Q billed for a "custom" back brace that purportedly was given to Patient GB from the receptionist at one of the Clinics, despite the fact that Patient GB was never measured or fitted for the "custom-fitted" device or informed why he received the equipment or how to use the equipment.

  (iii) Top Q billed for a "custom" back brace (and various other items) that purportedly was given to Patient SC from the receptionist at one of the Clinics, despite the fact that Patient SC was never measured or fitted for the "custom-fitted" device or informed why he received the equipment or how to use the equipment.  Additionally, Top Q billed GEICO for other items that patient SC never actually received.

  (iv)  Top Q billed for a "custom" back brace that purportedly was given to Patient WG from the receptionist at one of the Clinics, despite the fact Patient WG was never measured or fitted for the "custom-fitted" device or was never informed why she received the equipment or how to use the equipment.

  (v)   Top Q billed for a "custom" back brace that purportedly was given to Patient RS from the receptionist at one of the Clinics despite the fact that Patient RS was never measured or fitted for the "custom-fitted" device or informed why he received the equipment or how to use the equipment.  Additionally, Top Q billed GEICO for other items that patient RS never actually received.

**V.  The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

111.  The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the provision of DME and orthotic devices to Insureds, and their actual submission of charges to GEICO.

112.    To induce GEICO to promptly pay the charges for the DME and orthotic devices, the Defendants have gone to great lengths to systematically conceal their fraud. Specifically:

(i)     The Retail Defendants deliberately failed to provide, with their initial billing submissions, purchase invoices illustrating the manufacturer, make, model, size, and quality of the goods, thereby concealing the true nature and quality of the products.

(ii)    The Retail Defendants secretly entered into kickback agreements with various Clinics whereby the Clinics provided the Retail Defendants with uniform, generic prescriptions that were used by the Retail Defendants to support their fraudulent claims.

(iii)   The Retail Defendants supported many of their claims with prescriptions that they knew were fraudulent.

(iv)    To the extent that the New York State Medicaid program established fees payable for a given class of DME and orthotic devices, the Retail Defendants knowingly mischaracterized the nature of the items so as to claim reimbursement at a higher fee payable.

(v)     The Retail Defendants knowingly and secretly dispensed substandard and arguably counterfeit products and submitted charges for such products using HCPCS codes they knew did not represent the true nature and quality of the products dispensed.

(vi)    Despite GEICO's lawful request for information, the Retail Defendants deliberately failed to provide purchase invoices illustrating the amounts that they actually paid for the DME and orthotic devices purportedly provided to GEICO Insureds.

(vii)   The Retail Defendants secretly engaged in kickback schemes with the Wholesale Defendants for the inexpensive products and with and the Clinic representatives for the prescriptions used by the Retail Defendants to support their claims.

113.    To induce GEICO to promptly pay the fraudulent charges, the Retail Defendants, routinely file expensive and time-consuming litigation against GEICO and other insurers if the fraudulent charges are not promptly paid in full, despite the fact that the Retail Defendants are aware that their billing and claims are fraudulent.

114.    GEICO is under a statutory and contractual obligation to promptly and fairly process claims within 30 days.  The documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations, omissions, and acts of fraudulent concealment described above, were designed to and did cause GEICO to justifiably rely on them.  As a proximate result, GEICO has incurred damages of more than $192,000.00 based upon the fraudulent charges.

115.    Because of the material misrepresentations and other affirmative acts taken by the Retail Defendants to conceal their fraud from GEICO, GEICO did not discover and should not reasonably have discovered that their damages were attributable to fraud until shortly before it filed this Complaint.

116.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claims denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

117.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through TOP Q; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through TOP Q, yet failed to obtain compliance with the request for additional verification; or else (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through TOP Q, or else to request additional verification of those claims, has not expired.

## FIRST CAUSE OF ACTION AGAINST TOP Q
### (Declaratory Judgment Under 28 U.S.C. § 2201)

118.     GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 117 of this Complaint as if fully set forth at length herein.

119.     There is an actual case in controversy regarding more than $335,000.00 in fraudulent billing for DME and orthotic devices that allegedly have been provided to GEICO's Insureds.

120.     GEICO contends that TOP Q has no right to receive payment for any pending bills they have submitted because:

(i)     TOP Q made false and fraudulent misrepresentations to GEICO concerning the maximum permissible charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying TOP Q "No-Fault" reimbursement to which TOP Q was not entitled;

(ii)     TOP Q's charges were and are the byproducts of improper agreements between the Clinics which permitted TOP Q to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Davidov is not and never has been a licensed chiropractor or physician;

(iii)     TOP Q made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices using HCPCS Codes they knew did not correspond to the items they purported to dispense to GEICO Insureds; and

(iv)     Defendant TOP Q failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

122.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     TOP Q has no right to receive payment on any pending bills submitted to GEICO because it knowingly made false and fraudulent misrepresentations to GEICO concerning the maximum permissible

charges for the DME and orthotic devices it allegedly provided to Insureds in order to induce GEICO into paying TOP Q "No-Fault" reimbursement to which TOP Q was not entitled;

(ii)    TOP Q has no right to receive payment on any pending bills submitted to GEICO because TOP Q's charges were and are the byproducts of improper agreements between Clinics and the Retail Defendants which permitted TOP Q to dispense particular products to Insureds despite the fact that those goods were never prescribed for the patients and despite the fact that Davidov is not and never has been a licensed chiropractor or physician;

(iii)   TOP Q made false and fraudulent misrepresentations to GEICO by submitting charges for DME and orthotic devices using HCPCS Codes they knew did not correspond to the items they purported to dispense to GEICO Insureds; and

(iv)    Defendant TOP Q failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

## SECOND CAUSE OF ACTION
### Against Davidov and TOP Q
### (Common Law Fraud)

123.    GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 122 of this Complaint as if fully set forth at length herein.

124.    Davidov and TOP Q intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for DME and orthotic devices.

125.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim for DME and orthotic devices for which the New York State Medicaid program has established fees payable, the representation that the goods represented in the billing actually were the goods intended to be provided to Insureds by the prescribing physicians.

    (ii)    In every claim, concealment of the fact that the Retail Defendants knowingly provided inexpensive and arguably counterfeit products to Insureds so as to realize profits that far exceeded the profits it would have realized had they dispensed legitimate, quality products.

    (iii)    In every claim, concealment of the fact that the Retail Defendants actually delivered all of the products to the Insureds when in reality, the Retail Defendants delivered the goods to the Clinic representatives who provided the Insureds with some, not all of the goods.

    (iv)    In every claim, concealment of the fact that the DME and orthotic devices were prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Davidov and TOP Q paid kickbacks to the Clinics to induce the Clinics to direct their associated physicians to: (a) prescribe large amounts of medically unnecessary DME and orthotic devices and (b) write the prescriptions in a generic non-descript manner – both designed to permit Davidov and TOP Q to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to GEICO and other New York automobile insurers.

    (v)    The Retail Defendants failed and/or refused to adequately respond to GEICO's proper requests for additional verification, thereby breaching a condition of coverage and relieving GEICO of any obligation to pay the fraudulent claims.

126.    Davidov and TOP Q made false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges that were not compensable under the No-Fault Laws, or that were far in excess of the charges that otherwise would be compensable under the No-Fault Laws.

127.    GEICO justifiably relied on the false and fraudulent representations made by Davidov and TOP Q, and as a proximate result has incurred damages of more than $192,000.00 based upon the fraudulent charges.

128.    The extensive fraudulent conduct of Davidov and TOP Q demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

129.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Davidov and TOP Q**
**(Unjust Enrichment)**

130.   GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 129 of this Complaint as if fully set forth at length herein.

131.   As set forth above, Davidov and TOP Q engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

132.   When GEICO paid the bills and charges submitted by or on behalf of TOP Q for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts of Davidov and TOP Q.

133.   TOP Q and Davidov have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

134.   Retention of GEICO's payments by Davidov and TOP Q violates fundamental principles of justice, equity and good conscience.

135.   By reason of the above, the Davidov and TOP Q have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $192,000.00.

### FOURTH CAUSE OF ACTION
**Against the Wholesale Defendants**
**(Aiding and Abetting Fraud)**

136.   GEICO repeats and realleges each and every allegation contained in Paragraphs 1 through 135 of this Complaint as if fully set forth at length herein.

137.   The Wholesale Defendants knowingly aided and abetted the fraudulent scheme perpetrated on GEICO by the Retail Defendants.

138.   The acts taken by Wholesale Defendants in furtherance of the fraudulent scheme include: (i) providing the Retail Defendants with substandard DME and orthotics they knew would be dispensed by the Retail Defendants to GEICO Insureds; (ii) knowingly creating fraudulent wholesale invoices by intentionally mischaracterizing the true costs of the products in order to support the fraudulent billing submitted to GEICO and other New York automobile insurers through Top Q; (iii) knowingly creating fraudulent invoices through the deliberate omission of the most basic information associated with the DME and orthotic supplies provided, including the  manufacturer, make and/or model of the supplies; and (iv) knowingly supporting the negotiation and performance of kickback agreements between the Retail Defendants and the Clinics.

139.   The conduct of Wholesale Defendants in furtherance of the fraudulent scheme was significant, material and a necessary part of the fraudulent scheme because without their actions, there would be no opportunity for the Retail Defendants to fraudulently obtain payments from GEICO and from other New York automobile insurers

140.   The Wholesale Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges for DME and orthotic devices that were not compensable under the No-Fault Laws, or were compensable at a much lower rate, because they sought to continue profiting through the fraudulent scheme.

141.   The conduct of Wholesale Defendants caused GEICO to pay money based upon the fraudulent charges submitted through Top Q  in an amount to be determined at trial, but in no event less than the total sum of $192,000.00.

142.   The extensive fraudulent conduct of the Wholesale Defendants demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

143.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## JURY DEMAND

144.   Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.   On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that TOP Q has no right to receive payment for any pending bills submitted to GEICO, totaling an amount believed to exceed $335,000.00;

B.   On the Second Cause of Action against Davidov and TOP Q, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $192,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C.   On the Third Cause of Action against Davidov and TOP Q, more than $192,000.00, in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper

D.      On the Fourth Cause of Action against the Wholesale Defendants, compensatory

damages in favor of GEICO in an amount to be determined at trial but in excess of $192,000.00,

together with punitive damages, costs, interest and such other and further relief as this Court

deems just and proper.

Dated: Uniondale, New York
        August 28, 2018

                                        RIVKIN RADLER LLP

                                        By:_____
                                           Barry I. Levy
                                           Michael A. Sirignano
                                           Justin A. Calabrese
                                        926 RXR Plaza
                                        Uniondale, New York 11556-0926
                                        Telephone:    (516) 357-3000
                                        Facsimile:    (516) 357-3333

                                        *Counsel for Plaintiffs, Government Employees
                                        Insurance Company, GEICO Indemnity Company
                                        GEICO General Insurance Company and GEICO
                                        Casualty Company*